IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)


S & R AMERICAN FARMS V. RUSSELL FARM & RANCH


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


S & R AMERICAN FARMS, LLC, APPELLEE,

V.

RUSSELL FARM AND RANCH CORP., APPELLANT, AND TODD RUSSELL ET AL., APPELLEES.


Filed December 6, 2016.    No. A-15-998.


Appeal from the District Court for Custer County: KARIN L. NOAKES, Judge. Affirmed.

Patrick J. Nelson, of Law Office of Patrick J. Nelson, L.L.C., for appellant.

Arend R. Baack, of Leininger, Smith, Johnson, Baack, Placzek & Allen, for appellee S & R American Farms, LLC.


MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

RIEDMANN, Judge.

### INTRODUCTION

Russell Farm and Ranch Corporation (Russell) appeals from the order of the district court for Custer County granting summary judgment in favor of S & R American Farms, LLC (S & R). S & R originally brought this action to quiet title to a portion of land along the property line separating its property from that of Russell. S & R also sought to affirmatively determine the northern boundary of the land that it claimed to own. Following an adverse judgment, Russell appeals. Based on our review of the record, we affirm.

### BACKGROUND

S & R and Russell are riparian landowners along the Middle Loup River in Custer County, Nebraska. S & R is the record owner of portions of government Lots 3, 4, 5, and 6 in Section 31,

Township 20 North, Range 20 West of the 6th P.M. The Middle Loup River runs along the northern edge of S & R's property. Russell owns the land directly north of the river, across from the S & R property involved in this matter.

The crux of this dispute is regarding an area of land that the parties have referred to as an "island." The original government survey of this portion of land, dating to 1873, showed the river as a single channel as it passed along the property. The disputed island was located north of the river, separated from the S & R property by the channel flowing to the south of it. The next depiction of this portion of the river is an aerial photograph taken in 1938. The river was no longer a single channel, but rather had multiple channels and depicted several islands where previously there had been none.

Aerial photography of the river over the next decades showed that the flow of the river began shifting north, away from S & R's property and towards Russell's property. Over time, water ceased to flow in the southern channel that had once separated the island from the S & R property.

By 1988, the river was once again a single channel, which now flowed to the north of the disputed land. Since this time, Russell can only reach this land by crossing the river or by crossing through S & R's property. While the parties agree that the main channel now flows north of the island, they dispute the mechanism by which the river moved to the north as well as the boundary between their properties.

S & R initiated these proceedings in November 2014 to quiet title as to the disputed land and establish the northern boundary of its property. Both parties retained their own surveyor and geographer to examine the land in question. S & R's surveyor, Mitchell Humphrey, inspected the property and created a survey of the area, which he then filed with the Nebraska survey record repository. Humphrey identified what he believed to be the thread of the stream, located north of the land in question, and incorporated that location into the legal description of S & R's property on the survey.

Russell's surveyor, Trenton Snow, also prepared a survey of the area in question. This survey differed from that of Humphrey and identified the "boundary thread of the stream" to be in a different location from the thread of the stream. However, in his deposition, Snow agreed that the physical location of the current thread of the stream is north of the disputed property, a position consistent with that of Humphrey. Both parties also asked their expert geographers to opine as to how the course of the river changed, but they could not say for certain how such changes had occurred.

During the discovery process, Russell requested a complete copy of Humphrey's file. S & R obliged, but informed Russell that there were several documents that it had not turned over, claiming that they were subject to attorney-client privilege and the work product doctrine. Specifically, S & R stated that the documents were emails between counsel and its surveyor, Humphrey. Russell then served additional interrogatories and requests for document production on S & R seeking the contents of those emails. When S & R objected to these requests, Russell filed motions to compel with the district court. S & R filed a motion for a protective order concerning the information that Russell was seeking.

A hearing was held on March 26, 2015. After receiving evidence and hearing argument from counsel, the district court overruled Russell's motions to compel and granted S & R's motion for a protective order.

S & R then filed a motion for summary judgment, arguing that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law. In support of its motion, it included an affidavit from Humphrey. Attached to the affidavit was a copy of the survey he had created, although it was not a certified copy. Russell objected to the admission of this survey on foundational grounds but the objection was overruled.

The district court subsequently granted summary judgment in favor of S & R. It determined that S & R had presented uncontested evidence that the changes to the river had occurred due to accretion, and while Russell suggested that the changes were due to avulsion, it offered no evidence in support of that claim. The district court also found that Humphrey's survey had been properly filed pursuant to Neb. Rev. Stat. § 81-8,122.01 (Reissue 2014) which therefore made it the official record and established presumptive evidence of the facts stated therein. Because Russell had not presented sufficient evidence to overcome such presumption, it determined the northern boundary of S & R's property as the thread of the stream. Russell now appeals.

## ASSIGNMENTS OF ERROR

Russell assigns, restated and reordered, that the trial court erred in (1) overruling its motion to compel S & R to respond to interrogatories relating to communications between S & R and its surveyor expert witness; (2) overruling its motion to compel S & R to respond to a request for document production relating to communications between S & R and its surveyor expert witness; (3) overruling its motion seeking authorization to serve a Neb. Ct. Disc. R. 6-334(A) subpoena on S & R's surveyor expert witness and his employer for documents relating to communications between S & R and its surveyor expert witness; (4) sustaining S & R's motion for a protective order regarding Russell's discovery requests; (5) overruling its foundational objection to a portion of Humphrey's affidavit offered in connection with summary judgment proceedings; (6) overruling its objection to a portion of Dart's affidavit offered in connection with summary judgment proceedings on grounds of speculation and conjecture, and (7) granting summary judgment in favor of S & R and establishing the northern boundary of land as depicted in Humphrey's survey.

## STANDARD OF REVIEW

Generally, decisions regarding discovery are directed to the trial court and an appellate court will uphold them absent an abuse of discretion. *Roskop Dairy v. GEA Farm Tech.*, 292 Neb. 148, 871 N.W.2d 776 (2015). An abuse of discretion exists when a judge acts or refrains from acting and the result is clearly untenable and unfairly deprives a litigant of a substantial right or just result. *Podraza v. New Century Physicians of Neb.*, 280 Neb. 678, 789 N.W.2d 260 (2010). The party asserting error in a trial court's ruling on discovery bears the burden of showing that the ruling was an abuse of discretion. *Id.*

In a civil case, the admission or exclusion of evidence does not constitute reversible error unless it unfairly prejudiced a substantial right of the complaining party. *In re Estate of Clinger*, 292 Neb. 237, 872 N.W.2d 37 (2015).

An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Bixenmann v. Dickinson Land Surveyors*, 294 Neb. 407, 882 N.W.2d 910 (2016). In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence. *Id*.

ANALYSIS

DISCOVERY MOTIONS

Russell assigns four separate errors relating to discovery orders entered by the district court. These orders included an order (1) overruling a motion to compel answers to interrogatories; (2) overruling a motion to compel responses to request for production of documents; (3) overruling a motion to serve a Rule 6-334(A) subpoena; and (4) sustaining S & R's motion for protective order. Of these assigned errors, however, S & R argues only the order overruling its motion to compel production of documents and, tangentially, the order sustaining S & R's motion for protective order. Therefore, we do not address the other two assigned errors. See *Olson v. Olson,* 13 Neb. App. 365, 693 N.W.2d 572 (2005)(errors must be assigned and argued to be reviewed by an appellate court).

S & R refused to produce email messages between its counsel and Humphrey, its expert surveyor, claiming the documents were privileged attorney client documents or otherwise protected under the work-product doctrine. It sought a protective order pursuant to Neb. Ct. R. Disc. §6-326(b)(4), which the district court granted. Russell argues that S & R had the burden of proving that the requested documents were privileged and that S & R did not meet that burden. Most of Russell's argument focuses on the procedures required for asserting privilege set out in *Greenwalt v. Wal-Mart Stores*, 253 Neb. 32, 567 N.W.2d 560 (1997).Under the *Greenwalt* framework, Russell argues that in order to assert either attorney-client privilege or the work product doctrine, S & R should have stated with specificity how each element of the asserted privilege was met, which Russell claims it did not do. Russell also asserts that the district court should have ordered that the documents be turned over to the court so the court could review the material in camera.

We find Russell's reliance on *Greenwalt* to be misplaced. While some of the issues in the present case are similar to those in *Greenwalt*, it can be distinguished because *Greenwalt* concerned production of the defendant's internal documents, whereas the current case concerns production of documents from an expert witness. The inclusion of an expert witness invokes additional rules of discovery that are more appropriately tailored for reviewing the issues present here. Instead, we find the case *Podraza v. New Century Physicians of Neb.*, 280 Neb. 678, 789 N.W.2d 260 (2010), to be instructive.

In *Podraza*, the defendant inadvertently forwarded to the plaintiffs correspondence between one of its paralegals and its expert witness. *Id.* New Century then sought a protective order prohibiting the Podrazas from using that information and ordering them to destroy all copies of the emails on the grounds that they constituted privileged work product. *Id*. Podrazas challenged this assertion. The Nebraska Supreme Court undertook an analysis pursuant to Neb. Ct. R. Disc.

§§ 6-326(b)(3) and 6-326(b)(4) and determined that the correspondence constituted privileged work product. *Id.* The Court also found that in order to obtain privileged work product, a party must, at a minimum, demonstrate a substantial need for the materials and an inability, without undue hardship, to acquire a substantial equivalent. *Id.*

Nebraska Discovery Rule § 6-326(b)(3) discusses the work product doctrine. It states, in relevant part:

> Trial Preparation: Materials. Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his or her attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his or her case and that he or she is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Subsection (b)(4) of the same rule pertains specifically to expert witnesses. In relevant part, it states:

> Trial Preparation: Experts. Discovery of facts known and opinions held by experts otherwise discoverable under the provisions of subdivision (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial may be obtained only as follows:
>
> (A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

These rules make clear that to be granted discovery of work product materials, a party must, at minimum, demonstrate a substantial need for them and an inability to obtain a substantial equivalent without enduring undue hardship. Furthermore, the rules lay out what a party is entitled to discover in terms of an expert witness' opinion developed in preparation for litigation. A party is entitled to know the identity of the expert, the subject matter upon which he or she will testify, the substance of his or her testimony, and a summary of the grounds for forming his or her opinion.

Russell has not demonstrated a substantial need for the email correspondence between counsel and S & R's surveyor expert witness. Additionally, Russell has not shown that it is unable to obtain the substantial equivalent without undue hardship. Russell admits that it has deposed Humphrey. Such deposition gave Russell the opportunity to find out what Humphrey's opinion was as well as the facts upon which he relied to form that opinion. S & R asserts that the only additional information in the requested emails constitutes work product insofar as it reflects counsel's opinions and legal strategies prepared in anticipation of trial. There has not been any showing made that the content of the requested emails contains anything to which Russell is

entitled that it has not already received or had the opportunity to explore during deposition. In the absence of a showing of substantial need for the emails beyond what has already been provided to Russell under § 6-326(b)(4), we find no abuse of discretion in the district court's decision to overrule Russell's motion to compel.

As to the district court's ruling in favor of S & R on its motion for a protective order regarding Russell's discovery requests, we turn to Neb. Ct. R. Disc. § 6-326(c). It states in part:

> Protective Orders. Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.

The Nebraska Supreme Court has held that Nebraska law gives trial courts broad latitude to grant protective orders in order to prevent the disclosure of materials for many types of information. *Gonzalez v. Union Pacific R.R. Co.*, 282 Neb. 47, 803 N.W.2d 424 (2011). The U.S. Supreme Court has also interpreted this language in the same manner, explaining that such wide latitude is necessary because the "trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery." *Id.* We again note that Russell did not specifically argue this assignment of error in its brief. However, we find the underlying issues to be closely related to those regarding its motion to compel. Having concluded that the district court did not err in denying Russell's motion to compel the production of emails between S & R and its expert witness, we defer to the broad discretion of the district court, and its weighing of the parties' interests, in finding that the subject material required an order of protection. We therefore find no abuse of discretion.

### FOUNDATIONAL OBJECTION TO HUMPHREY'S AFFIDAVIT

Russell asserts that the district court should have sustained its foundational objection to the survey attached to Humphrey's affidavit. Russell's objection was that the copy of the survey was neither sworn nor certified, thereby violating Neb. Rev. Stat. §§ 25-1334 and 27-902 (Reissue 2008). We disagree.

Nebraska Evidence Rule 902 states that extrinsic evidence of authenticity as a prerequisite to admissibility is not required for certain kinds of documents, such as copies of an official record or report, or a document authorized by law to be recorded or filed, and actually recorded or filed, in a public office when it is certified as correct by the custodian or other person authorized to make the certification. Neb. Rev. Stat. § 27-902 (Reissue 2008). While such documents may be considered "self-authenticating," this does not preclude authentication by other means. Indeed, if a proffered document is not self-authenticating, it necessarily must be authenticated using extrinsic evidence.

Nebraska Revised Statutes § 25-1334 (Reissue 2008) speaks to the requirements for supporting affidavits and provides in relevant part:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

With specific regard to public records, Neb. Rev. Stat. § 27-1005 (Reissue 2008) states:

The contents of an official record, or of a document authorized to be recorded or filed and actually recorded or filed, including data compilations in any form, if otherwise admissible, may be proved by copy, certified as correct in accordance with section 27-902 or testified to be correct by a witness who has compared it with the original.

This court has previously held that an affidavit stating that the affiant had personal knowledge of an attached copy of a public record, and that such record was a true and correct copy of the original, could be properly admitted. *Hoff v. Ajlouny*, 14 Neb. App. 23, 703 N.W.2d 645 (2005). In *Hoff*, the plaintiff alleged that Ajlouny had violated certain protective covenants to which his residence was subject. *Id.* A copy of the protective covenants was recorded in the office of the register of deeds for that county. *Id.* Hoff filed a motion for summary judgment that included a copy of the protective covenants and an affidavit by her attorney, which swore to the authenticity of the attached covenants. *Id.* Ajlouny argued that the copy of the protective covenants should not have been admitted into evidence on the grounds that insufficient foundation had been laid. *Id.* This court performed an analysis under Neb. Rev. Stat. §§ 25-1334 and 27-1005 and determined that the attorney's affidavit, which stated that he had personal knowledge of the relevant facts and swore that the accompanying exhibit was a true and correct copy of the protective covenants as recorded in the office of the register of deeds, was sufficient and the attached exhibit could properly come into evidence. *Id.*

We find the case before us now to be factually similar to *Hoff*. As in *Hoff*, we are presented with a copy of a public record, Humphrey's survey, which has not been certified and is not self-authenticating. We are also presented with an affidavit from a party, Humphrey, swearing to have personal knowledge and swearing that the copy is true and correct as to the original, which has been recorded or filed. Accordingly, we find that Humphrey's sworn affidavit provided sufficient foundation to authenticate the accompanying exhibit. Therefore, we find that the admission of the affidavit was proper and thus we find no merit in this assignment of error.

3. Summary Judgment

Russell next assigns that the district court erred in granting S & R's motion for summary judgment and establishing the northern border to its property. Specifically, Russell claims that the evidence presented at the hearing on summary judgment indicated that there were genuine issues of material fact. We disagree.

Before examining each party's argument, we first review the basic principles of water law. The term "thread of the stream" refers to the line in a body of water that would give landowners on both sides of it access to the water, particularly when it is at its lowest flow. *Curry v. Furby*, 20 Neb. App. 736, 832 N.W.2d 880 (2013). The thread of the stream is the deepest portion of the waterway, the area that would be last to dry up. *Id.* The location of the thread of the stream is significant because under Nebraska law, title to riparian land runs to the thread of the contiguous stream. *Id.* This means that finding the location of the thread of the stream is a necessary step in determining the legal boundary between riparian properties.

The course of a waterway may change due to accretion, reliction, or avulsion. Accretion refers to the gradual and imperceptible process whereby solid material is added to the shoreline, thus extending the land bordering the water. *Id.* Reliction refers to the gradual withdrawal of the

water from the land caused by the lowering of its surface level from any cause. *Id.* Avulsion, on the other hand, is a sudden and perceptible change to the land, either an addition or loss, due to the action of the water. *Id.* Avulsion is a violent and visible change to the waterway that results from a known cause, such as a freshet. *Id.*

These processes are significantly different from one another and have different consequences for the boundary line of the surrounding land. *Id.* When the waterway, and therefore the thread of the stream, changes over time due to the slow and natural processes of accretion and reliction, the legal boundary follows. *Id.* However, changes to the waterway due to avulsion do not affect the boundary, which remains at the location of the thread of the former stream. *Babel v. Schmidt*, 17 Neb. App. 400, 765 N.W.2d 227 (2009). When a party seeks to quiet title to land due to accretion or avulsion, he must prove such by a preponderance of the evidence. *Curry v. Furby, supra*.

Section 81-8,122.01 establishes that a survey, meeting certain foundational requirements, is presumptive evidence of the facts stated therein. It states in relevant part:

> Whenever a survey has been executed by a land surveyor who is registered under the Land Surveyors Regulation Act, a record of such survey bearing the signature and seal of the land surveyor shall be filed in the survey record repository established pursuant to section 81-412 if such survey meets applicable regulations. . . . The record of survey shall be filed within ninety days after the completion of the survey . . . and shall consist of the following minimum data: (1) Plat of the tract surveyed; (2) legal description of the tract surveyed; (3) description of all corners founds; (4) description of all corners set; (5) ties to any section corners, quarter corners, or quarter-quarter corners found or set; (6) play or record distances as well as field measurements; and (7) date of completion survey. The record of survey so filed shall become an official record of survey, and shall be presumptive evidence of the facts stated therein, unless the land surveyor filing the survey shall be interested in the same.

We explained the effect of this statute in *Curry v. Furby, supra*. In *Curry*, plaintiffs were riparian landowners whose property was separated from their southerly neighbors, the Furbys, by the Middle Loup River. *Id.* The Currys brought an action to establish the southern boundary of their property, which they alleged had changed due to accretion and reliction. *Id.* There, we found the survey of the Currys' land, including a legal description and the location of the thread of the stream, to be presumptive evidence of the boundary because it complied with the requirements of § 81-2,122.01. *Id.* Furthermore, we found that the Furbys did not adduce adequate evidence to overcome such presumption and thus affirmed the district court's order in favor of the Currys. *Id.*

In the present action, Humphrey's survey meets the foundational requirements of § 81-8,122.01 and is therefore presumptive evidence of the facts stated therein, including the thread of the stream and the northern boundary. To rebut the presumption of the boundary established in the Humphrey survey, it was incumbent upon Russell to present evidence that the thread of the stream changed through avulsion. It failed to do so.

Russell's experts did not adduce any affirmative evidence that an avulsive event occurred. Both experts admitted that they had no knowledge as to how the course of the river changed after the original 1873 survey. Russell's geographer stated that he had no way of knowing how the river

had changed. Russell's surveyor asserted that the river could have changed "different ways possibly, some sudden, some over time." However, beyond this speculation that the course of the river could have changed suddenly, he could not point to any evidence specifically supporting avulsion.

To the contrary, Humphrey opined that, after visiting the site in person, he did not see any evidence that an avulsive event had taken place. He noted the lack of scouring or scoring of the banks, which would have been an indication that avulsion had occurred. In his best estimation, he believed that the river had moved over time rather than suddenly.

In the absence of any evidence of avulsion, we find that Russell did not present sufficient evidence to overcome the statutory presumption. Viewing the evidence in the light most favorable to Russell, we find that there is no genuine issue of material fact. Humphrey's survey presumptively established the location of the thread of the stream, which runs north of the property in question, and Russell failed to overcome that presumption. We therefore find no merit in this assignment of error.

## REMAINING ASSIGNMENTS OF ERROR

Russell assigns three additional errors, concerning the district court's ruling in regards to Russell's motion to compel interrogatories, its motion seeking authorization to serve Neb. Ct. Disc. R. 6-334(A) subpoenas, and its objection to a portion of Dart's affidavit on grounds of speculation and conjecture. However, Russell's brief contains no argument pertaining to these assignments of error. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error in order to be considered by an appellate court. See *Olson v. Olson*, *supra*. We therefore do not address these assigned errors.

## CONCLUSION

We conclude that the district court did not err in finding no genuine issue of material fact as to the location of the thread of the stream, and thereby granting summary judgment in favor of S & R. Furthermore, we find that the district court did not err in its rulings on the discovery motions nor in overruling Russell's foundation objection to Humphrey's affidavit. We therefore affirm the district court's order in its entirety.

AFFIRMED.